**Opinion issued May 22, 2025.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00934-CV

_____

## IN THE INTEREST OF E. A. P. AND M. A. P.-R., Children

---

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 122157-F**

---

## MEMORANDUM OPINION

I.V. ("Mother") challenges the trial court's final decree terminating her parental rights to her minor children E.A.P. ("Eric") and M.A.P.-R. ("Mia") based on the court's findings that Mother committed the predicate acts under Texas Family Code Sections 161.001(b)(1)(D), (E), (N), and (O) and that termination of her rights

was in Eric's and Mia's best interest.[1]  Mother argues there is legally and factually insufficient evidence supporting the trial court's findings (1) that she committed the enumerated predicate acts or (2) that termination of her parental rights was in Eric's and Mia's best interest.

We affirm the decree of termination.

## Background

On December 14, 2022, the Department of Family and Protective Services ("Department") received a referral from the Angleton Police Department of neglectful supervision of one-year old Eric by Mother and his stepfather, "Mike." According to the referral, the police were dispatched to a home on Farrer Street in Angleton, Texas after Mike had a mental breakdown and "stated he wanted to be killed by the police, threatened officers, and threatened to burn the house down." Mother, who was seven months pregnant with Mia, and Eric were in the house with Mike.  The home where the incident occurred was owned by Mike's mother, L.H. ("Laura").  According to the referral, the officers eventually were able to subdue Mike and transport him to a psychiatric hospital.

---

[1]     To protect the identity of the minor children, we refer to them and their foster parents by pseudonyms and we refer to the children's biological parents as Mother and Father.  *See* TEX. R. APP. P. 9.8(b)(2).

## A.    Veronica Jones

Veronica Jones, the Department investigator, testified that she went to Laura's home on December 19, 2022, where she spoke to Mike, Mother, and Laura about the incident on December 14.  Jones testified that the home seemed appropriate for Eric, and she did not get the impression that Mother or Laura felt that Mike was still a threat.  Jones testified that the Department removes a child only if the child is in immediate danger, and she did not believe that Eric was in immediate danger when she visited Laura's home.

Mother told Jones that she was from El Paso, Texas and she and Mike had been living in Laura's house for two weeks.  According to Mother, they were trying to put Eric down for a nap.  Laura came into the room and tried to take Eric from Mike "so she could put [Eric] down because [Mike] wasn't able to console him."  When Laura told Mike to give Eric to Mother, Mike "became angry and started yelling and screaming at [Laura] and cussing at her."  Laura and Mother called the police.

Mother told Jones "there were police [officers] surrounding the house, their guns were drawn, they were on their knees in the backyard, front yard, and more kept coming."  Mike had a knife in the waistband of his shorts, and he told the officers that "if [they] came in, he would hurt them or they would have to kill him if they came in."  According to Mother, the officers were in the house for about two

hours, and Eric was with Mother the entire time. Mother claimed that she stayed in the house because she was trying to calm Mike down and she was afraid the police would hurt him. She told Jones she was not concerned for her safety during the ordeal. She denied that Mike had held her against her will, and she told Jones she could have left the house at any time.

Mike, who admitted to having a knife with him, told Jones he was afraid of the police. He admitted stating that "if the police entered the home, they would have to kill him." Mike told Jones that Laura's husband and a mental-health officer from the sheriff's department calmed him down, and he was transported to St. Joseph's Hospital's behavioral-health unit. Mike stated he never told Mother she could not leave nor did he hold Mother against her will. According to Mike, he told Mother she could go.

Jones testified that Mother, Mike, and Laura signed a safety plan agreeing that Mother, Mike, and Eric would continue to live with Laura and Laura would always supervise them. A Department safety plan is not a court order and is not enforceable. Mother and Mike also agreed to participate in family-based safety services. Jones asked Mother and Mike to participate in services because she was concerned about Eric's safety given that neither Mother nor Mike recognized Eric had been in danger during the police standoff and also because of Mike's mental health issues.

As part of her investigation, Jones spoke to Eric's biological father S.S. ("Steve"). According to Steve, Mother told him that Mike "gets angry" and "had put his hands on her" before the incident on December 14. Jones also located a police report from the El Paso Police Department concerning an incident on May 26, 2022 involving Mother, Mike, and Eric. According to the police report, Mike pulled a gun on Mother's mother, Isabella Shaw, and Shaw's boyfriend, causing them to be in fear for their lives. Mother, who was holding five-month-old Eric in her arms, was standing next to Mike when he brandished the weapon. According to Jones, Mother told Mike that things had gone too far, and they walked back inside their apartment.

Jones, who maintained contact with the family, received additional information from Mother and Laura after her December 19, 2022 visit to Laura's home. After speaking to Laura, Jones was concerned that Mike and Mother were "arguing and fighting" and the "safety plan was going to break down." Mother contacted Jones on December 25, 2022, and she told Jones that it was stressful living in Laura's home, and she asked Jones if she could move back to El Paso. Jones told Mother she could move to El Paso because there was no court order in place prohibiting her from doing so, but if she moved to El Paso with Eric, Mother needed to give Jones her new address. This was necessary to allow Jones to transfer the case to El Paso, and the new caseworker could then "do a home assessment and all

5

of that to ensure that [Eric] would be safe where he was going." Mother asked Jones for money to get to El Paso, but Jones was not able to provide Mother with financial assistance at the time.

Jones testified that Mother called her on January 12, 2023, and told her she and Mike "didn't need [the Department's] services anymore." Mother told Jones that the caseworker she met with had not explained things, and they did not like the interaction that they had with her. Because Mother and Mike were no longer voluntarily participating in family-based safety services, the Department filed a petition requesting the court to render a temporary order requiring Mother and Mike to participate.

The trial court held a hearing on the Department's petition on February 16, 2023, and Mother and Laura attended. Mother, who had given birth to Mia less than two weeks prior to the hearing, testified that Mike was working out of town, and he would not be back soon. Mother agreed to participate in services. Jones testified at trial that Mother and Laura had been bringing Eric and Mia to court and she became concerned about the children when she realized they were not in the courtroom for the February 16 hearing. According to Jones, Mike, Mother, and Laura had previously told her they did not have anyone other than Laura to watch the children. After Jones informed her colleagues and the trial court that she was concerned about

6

the children's absence, the police made a welfare check at Laura's home and found Mike there with Eric and Mia. They arrested Mike on an unrelated charge.[2]

After the hearing, the trial court issued a "Temporary Order For Required Participation in Services." Although the Department had petitioned for an order to participate for Mother and Mike, the court found the Department had been unable to serve Mike and dismissed Mike from the suit. The order to participate required Mother to participate in services, and it required Laura to supervise Mother and Mike at all times Mother or Mike were with Eric.[3] Jones testified that her role in the case ended when the trial court issued the order to participate.

## B.     Heather Mendoza

Heather Mendoza is a family-based safety service caseworker. She was assigned to the case on March 10, 2023. Mendoza, who met with the family on March 13, 2023, returned to Laura's home a day later after she learned that Mike had been arrested and charged with the Class A misdemeanor offense of terroristic threat against a family member. According to the complaint, Mike threatened to assault Laura, placing Laura in fear of imminent serious bodily injury. On April 6, 2023, Mike pleaded guilty to the offense and was placed on deferred adjudication.

---

[2]     The clerk's record reflects that Mike was arrested on February 16, 2023 for "Assault Causes Bodily Inj[ury], Misdemeanor- Class A, Dismissed." Jones, however, did not explain why Mike was arrested during the hearing.

[3]     Mia, who was eleven days old, was not subject to the order to participate.

Mendoza testified that the Department was concerned about Mike's behavior and his mental stability because this was the third incident of alleged domestic violence perpetrated by Mike. The Department was also concerned because Mother and the children continued to live with Mike. At Mendoza's request, the family signed an agreement prohibiting Mike from living in Laura's home due to the Department's concerns about Mike's untreated mental health and the terroristic threat to Laura.

Mendoza testified that she began receiving calls from Mother and Laura on March 15, 2023. According to Mendoza, Laura claimed that Mother was not allowing her to supervise Mother and the children and Mother and Laura were calling the police on each other. On March 17, Mother told Mendoza that she did not want to live in Laura's home, and she wanted to return to El Paso. Mendoza told Mother that she could not leave with the children because the order to participate required Laura to supervise Mother any time Mother was with Eric. Mendoza told Mother that if she provided the Department with the address and contact information for her family in El Paso, Mendoza would try to have the case transferred there. Mother gave Mendoza the names of her mother, Isabella Shaw, and her great-grandmother, Maria Duarte, but the Department was unable to transfer the case to El Paso at that time because the courtesy caseworker in El Paso was not able to contact Mother's relatives.

Mendoza testified that the placement broke down completely on March 23, 2023. According to Mendoza, Mother took the children to a medical appointment and when they returned to Laura's home, Mother found her and the children's belongings in Laura's yard. Mendoza went to Laura's home and met with Mother. According to Mendoza, she and Mother spent hours trying to find somewhere suitable for Mother and the children to spend the night, but they were unsuccessful. Mendoza told Mother that if she agreed to leave the children with Laura for a few days, the Department would not need to remove the children from her care. Mother refused to allow the children to stay with Laura. Because they had been unable to locate a suitable alternative placement where Mother and the children could be supervised, the Department removed the children and placed them in foster care.

On March 24, 2023, the Department filed an original petition seeking to terminate Mother's, Mike's, and Steve's parental rights to the children. The trial court scheduled an adversary hearing for April 6, 2023, which was reset to April 20. At the beginning of the April 20 hearing, the trial court held that Eric and Mia had to be returned to Mother's care because the children had been removed without a court order, and the Department failed to have a hearing before the trial court within twenty-four hours of the removal as required by the Section 262.105 of the Texas Family Code. The trial court proceeded with the adversary hearing, which was recessed until April 27, and then reset for May 11, 2023.

On April 21, 2023, Eric was placed with a family friend, and Mia was returned to Mother and Mike, who were living in an apartment in Freeport, Texas. Mother was able to rent the apartment with $900 she received from Duarte, her great-grandmother, after the children were placed in foster care. Mendoza testified that she visited Mother's apartment daily to check on Mia because they were concerned about Mike's mental health.

On May 6, 2023, Mendoza asked the police to make a welfare check at Mother's apartment because she had trouble arranging to meet with Mother at her apartment. Mother, Mike, and Mia were in the apartment when the police arrived. Mother and Mike were arrested for the felony offense of robbery after the police ran a warrant check. The record reflects that the grand jury no-billed those charges on July 7, 2023. The Department took Mia into care after Mother and Mike were arrested and they placed her with a foster family, M.L. ("Mary") and G.L. ("Greg").

On May 8, 2023, the Department filed an original petition for conservatorship of Mia and termination of Mother's and Mike's parental rights to Mia. At the beginning of the adversary hearing on May 11, the parties announced they had entered into an agreement to have the Department appointed as Eric's and Mia's temporary managing conservator. Eric would be placed in the same foster home as Mia, and Mike and Mother would do services. The Department also agreed to conduct a home study of Shaw within thirty days of the hearing, but it was unable to

place the children with Shaw because she moved around a lot and had an old case that was "unable to determine." Consistent with the parties' agreement, the trial court entered temporary orders that designated the Department as the children's temporary managing conservator and required Mother and Mike to participate in court-ordered services.

After the hearing, the Department created family service plans for Mother, Mike, and Steve which among other things, required them to remain drug- and alcohol-free, maintain employment, provide a safe and stable home environment for the children, participate in counseling, attend all court proceedings, and visit regularly with the children.

## C.    Dr. Jenny Stadler

Dr. Jenny Stadler is a clinical psychologist. She was hired by the Department to complete psychological assessments for Mother, Mike, and Steve. Stadler's psychological evaluations of Mother, Mike, and Steve were admitted into evidence.

Stadler met with Mother at the Department's Angleton office twice in June 2023. Mother, who did not have a valid driver's license, reported that she was working at McDonald's and a vape store. She told Stadler that she was living with a friend at the time, but she planned to get her own apartment. Stadler testified that Mother seemed "like a relatively competent young woman."

11

When asked about her relationship with Mike, Mother told Stadler that they lived together for about a year, but they were currently separated because Mother "felt like [Mike] was lacking as a man because he wasn't providing for her well financially or providing for the child financially." Stadler testified that it was not "really clear what the dynamics of their relationship were" when she spoke to Mother because although Mother denied wanting to get back together with Mike, Mother also told her that she and Mike were "working on it slowly" and she did not "plan on breaking up with him." Stadler noted that Mike's and Mother's appointments with her were scheduled "concurrent with child visits" at the Department's office, and Mother and Mike arrived and left the office together.

Stadler also asked Mother about the incident at Laura's home on December 14, 2022. According to Stadler, Mother blamed Laura for the Department becoming involved with the family and claimed that the Department was only involved because of Laura's conflict with Mike. In her report, Stadler noted that Mother told her that Mike and Laura argued about putting Eric to bed, and the verbal dispute escalated when Laura tapped Mike on the shoulder several times. Mother decided to call the police because "in the past 'we'd call the police and they'd deescalate the situation.'" According to Mother, that was the first time Mike experienced a "mental outburst." Mother told Stadler

> The cops showed up; I wasn't able to talk to them; [Mike] was tripping and going crazy; the police had their hands on their holsters already;

12

> [Mike] was threatening to hurt himself if the cops came into the house; "You're going to have to shoot me if you come in"; he had a knife in his backpack; I was trying to calm him down; my baby [Eric] was sleeping; the police, fire department, SWAT came out; [Mike] wasn't understanding; finally they had a mental advocate come out, and [Mike's] stepfather came out; they talked to him and transferred him to the hospital.

Mother told Stadler that "she had remained in the home to 'calm him down; I do know what it's like to be in mental distress; I see the news.'" When asked if Mother was potentially unable to appreciate the seriousness of certain situations, Stadler testified that Mother was intelligent, acted like an adult and had "reasonable insight" for someone her age.

According to Stadler, Mother showed an interest in Eric's and Mia's lives and there was nothing about their relationship that seemed abnormal, and she had not gotten the impression that Mother would knowingly place the children in danger. Stadler testified that the results of Mother's written assessment indicated that Mother was not motivated to engage in services, but "when I spoke to her, she seemed to be motivated." According to Stadler, Mother "certainly seemed engaged in the process and was paying attention to what was in her best interest and her children's best interest."

Stadler testified that Mother, who reported having seizures three times the previous year, had a "possible seizure disorder," but nothing indicated that Mother had an emotional disorder. Mother told Stadler that she had "smoked weed a couple

of times" and she had a "bad experience" the one time she drank alcohol. Mother told Stadler that she had been arrested twice as an adult for assault by contact and robbery. According to Mother, the robbery charge arose from a recent incident in which Mother, who was nineteen years old, purchased an alcoholic drink for somebody using an app and the person she bought the drink from alleged that Mother stole it.

Stadler diagnosed Mother with Attention-Deficit/Hyperactivity Disorder, "combined presentation, which is impulsive and difficulty with attention" and she recommended that Mother receive "individual therapy, primarily based on strategies to improve impulse control." She also "strongly recommended that [Mother] have a medical evaluation to evaluate the seizures."

Stadler interviewed Mike at the Department's office in June 2023 and July 2023. When asked why he and Mother were separated, Mike told Stadler that it was "a personal reason" and "they planned to reunify." Stadler testified that Mike seemed to be "having some internal conflict in his role in what happened and what led to being involved with [the Department]," because he stated that he should not have argued with Laura but stated that "she was still going to shove me anyway." Mike told Stadler that he was holding Eric when Laura pushed him, causing him to "hit his heel on something, which caused a lot of pain, and then that led to this—somebody was acting out, somebody called the police, and then the SWAT team

14

came and it was a—you know, a big incident." He told Stadler that the pain to his heel "caused an escalation in their argument and then [Mother] felt like she needed to call the police to de-escalate them." Mike reported that he was in the hospital for two days and was diagnosed with anxiety. In her report, Stadler noted that in March 2023, Mike told the Department that he "was not following through with psychiatric care."

Mike told Stadler that he had been arrested four times and was on probation for a Class A misdemeanor. Mike also reported that he had a pending robbery charge which Stadler believed was related to Mother's pending robbery charge.

Although Stadler diagnosed Mike with only Adjustment Disorder with Anxiety, she was concerned that Mike was suffering from other more severe conditions, including Post-traumatic Stress Disorder with possible dissociative symptoms, Paranoid Personality Disorder, and Unspecified Schizophrenia Spectrum Disorder, but Stadler did not have enough information either to rule out or confirm a diagnosis.

Stadler met with Steve at the Brazoria County Jail in July 2024. Steve told Stadler that he had been in Eric's life for only two weeks and the last time he saw Eric in person, Mother and Mike showed up and he went off" on Steve during the incident. According to Steve, Mother "stole a car" and she and Mike "kidnapped my son." Steve reported that he had been arrested four times, charged with burglary

15

of a building, burglary of a vehicle, and sexual assault of a minor, and he would need to register as a sex offender when he was released. Steve claimed the minor "lied to him about her age and he was unaware that she was underage."

## D.    Joshua McCain

Deputy Joshua McCain is a mental-health deputy with the Brazoria County Sheriff's Office, and he was dispatched to Laura's home on December 14, 2022. McCain's incident report and a recording of his body camera footage were admitted into evidence. The video was played for the jury. Several officers with the Angleton Police Department were standing outside the home when McCain arrived.

When McCain first approached Mike, Mike was standing in the doorway of the home holding "a large kitchen knife in his right hand" and "threatening to kill any police officer[s] that stepped foot inside the door, making statements such as, 'you're gonna have to kill me.'" Mike told the officers he had "alcohol with a rag in it and he's going to blow it up" if anyone comes inside. McCain testified that Mike was dressed all in black and he "appeared to have a face mask on and a thick layer of clothing, like a hoodie or some outer shirt that was thick" and he told McCain that he was dressed that way because he did not want to be tazed. According to McCain, Mike's "largest concern was going to jail, and he kept [stating] he would rather everyone die than go back to jail." McCain testified that the "officers outside

16

were holding lethal coverage around the perimeter," meaning, they were surrounding the home with their guns drawn.

Mike agreed to speak to McCain after McCain explained that he was there to help Mike, not arrest him. McCain told Mike that he would only come inside the home if Mike put down the knife. When McCain entered the home, he "immediately observed a pregnant female [Mother], and what appeared to be a 1-year-old child [Eric] standing next to" Mike. Mother, who was standing three or four feet from Mike, was holding Eric in her arms. Although Mike had put down the knife, McCain noticed that Mike was "holding what appeared to be a makeshift Molotov cocktail [in his left hand], and a lighter in his right hand." McCain testified that a Molotov cocktail is "an alcohol bottle with a rag shoved in it that when you light it and throw it, it can cause a fire."

Mike told McCain that if the officers outside did not move back, "this bitch is gonna burn." Mother asked McCain if she and Mike could go for a walk to get him to calm down, and McCain told her that he did not mind if they went for a walk. McCain described Mike as being in a "state of anger due to possible PTSD." At one point, Mike told McCain he had four or five other knives.

McCain walked back outside because Mike had "picked up the knife, and I told him I wasn't going to continue talking to him if that was in his hand." McCain asked Mike if Mother and Eric could leave, and Mike told McCain, Mother was "not

17

going anywhere," and neither was Eric. McCain interpreted Mike's statement as a threat to Mother. When asked if Mike ever threatened Eric or Mother, McCain testified, "Not directly, but I believe that in his statement that 'I'll burn the house down with everybody in it' is an indirect threat." According to McCain, "[E]verything [Mike] said was indirect. It was never a direct statement of harm towards [Mother], but it was definitely a broad spectrum saying that he was going to." McCain never saw Mike point the knife at Mother.

When asked about Mother's demeanor during the incident, McCain testified that Mother appeared to be a little nervous at first, but she never appeared to be in distress or scared. Mother was not crying or shaking when she spoke to McCain. According to McCain, Mother was talking on her phone and making jokes towards the end of the standoff. McCain did not know if Mother was in the house the entire time, but he also did not see her leave.

When asked if the circumstances in the house with Mike during the standoff presented a dangerous situation, McCain testified that "it was 100 percent dangerous" for Mother and Eric to be in the house. According to McCain, the situation "might not have been as dangerous there towards the end, but at the beginning absolutely."

## E. Steve

Steve, Eric's biological father, testified at trial that he was serving a five-year sentence for the offense of sexual assault of a minor. He pleaded guilty to the charge on April 6, 2023 and was eligible for parole in 2025. Steve testified that Eric came into the Department's care because of the December 14, 2022 police standoff involving Mother and Mike.

Steve testified that the first time he met Eric, Eric was living with Mother and Mike in Brazoria County. Eric, who was born in El Paso, was a few months old and Steve was only around Eric for two weeks. When asked about Stadler's testimony regarding the last time Steve saw Eric, Steve testified that he was putting Eric in the car and he and Mother were taking Eric to buy diapers and pizza. Steve saw Mike approaching the car, and he asked Mother why Mike was there. According to Steve, Mother replied that she did not know why Mike was there and she told Steve to get in the car. Steve testified that he walked up to Mike and Mike punched him, then got in the car, and Mother drove off with Mike and Eric. Steve did not know why Mike punched him.

Steve testified that he did not believe Eric was in danger when Eric was with Mother. But when questioned by the Department about the December 14, 2022 police standoff and the incident with Mother and Mike the last time he saw Eric, Steve admitted those were dangerous situations.

19

## F. Mother

Mother testified that she, Mike, and Eric had moved from El Paso to Laura's home in Angleton two weeks before the December 14, 2022 incident. According to Mother, Mike and Laura began arguing when Mike was trying to put Eric down for a nap. After Laura pushed Mike, Mother tried to take Eric from Mike and Mother called the police. When asked why she remained in the house after she called the police, Mother testified that everything was happening very quickly, and she thought the police were coming to deescalate the situation. She testified that she was in shock when the police arrived, but she was "familiar with the situation" and she knew how to "stay calm and how to like work around the situation." Mother testified that she told Mike to "tell the police to have a mental health advocate come out" because she was "scared because [she] knew how bad this could escalate." Mother testified that she "didn't know it was going to escalate that extreme, but [she] knew it possibly could have escalated into something that happened." When asked what she meant by "something bad happening," Mother testified, "Just like police brutality or something of that sort."

Mother testified that things escalated when Mike told the police he would kill one of them if they came into the house. When asked why she did not leave the house after Mike threatened the police, Mother testified she did not leave because Mike "didn't direct that threat towards me. He directed it towards the police."

20

Mother testified that she was not afraid for herself or Eric. She did not believe that Eric was in physical danger during the police standoff because Eric was with her, and she did not believe Mike would be physically aggressive towards her or Eric. When asked if she thought Mike "holding a Molotov cocktail and . . . threatening a fire was a danger to [Eric,]" Mother testified that, at the time, she did not believe Eric was in danger. She said she was not bothered by watching the video of McCain's body camera, but watching the video gave her a new perspective of the "actual whole situation of its being a hostage situation" and "being actually very, very dangerous." Mother testified it did not feel like she was in a hostage situation at the time. She testified she had no intention of leaving the house, but she felt like she could leave the house with Eric anytime she wanted to go. When asked if Mike had ever "blown up a house before. . .that day," Mother said no. Mike had been angry before but that was the first time she witnessed him having a mental breakdown.

When asked about the May 2022 incident in El Paso when Mike allegedly held a gun on Shaw, Mother testified that Mike was wearing his gun on his hip. She testified that Mike had not pointed the gun at Shaw or anyone else. Mother was pregnant with Mia and was holding Eric in her arms during the incident and no one pointed a gun at her or threatened her. She did not believe Eric was in danger. Although he was angry, Mike "wasn't manic as he was on the 14th of December."

When asked why Mike hit Steve and she drove away with Mike and Eric immediately after, Mother testified that Steve was lying about it because it never happened.

Mother continued to live with Mike after he was discharged from the psychiatric hospital and she never felt that Eric was in danger around Mike. Mother testified that she stayed with Mike because she was pregnant with Mike's daughter, Mia, and Mike was working and they had plans to get their own apartment and start a family. They lived with Mike's mother Laura because they did not have anywhere else to go at the time. Mother was not working at the time, and she was financially dependent on Mike. Mother testified that when they were together, she believed that Mike was a good father because he used to change the children's diapers, and clothe, bathe, and feed them, and she trusted him around the children. She does not trust Mike or believe that he is a good father anymore.

Jones came to Laura's home a few days after the standoff. When Mother spoke to Jones in private, Mother agreed that the family needed some services, such as counseling and anger management, and she also agreed to allow Laura to supervise her and Mike when they were with Eric. The arrangement began to deteriorate quickly, and Mother called Jones on December 25, 2022, and told her that she wanted to move back to El Paso. Jones told Mother she and Eric could move back to El Paso and the case would need to be transferred there. Although Jones

22

told her she could leave, Mother testified that she did not feel she could go to back to El Paso because she had signed a safety plan. Mother did not move at that time because she did not "have the means to leave" and Jones did not offer her services or assistance relocating to El Paso.

Mother told Jones a few weeks later that she no longer needed any services because the caseworker who had come to the house to meet with her and Mike was "saying a lot of like outrageous things" and Jones was only communicating with Mike and Laura, not her.

On February 16, 2023, Mother attended a hearing for the Department's petition for an order to participate. At the hearing, Mother agreed to participate in services, which included a domestic violence evaluation, individual therapy, a mental health evaluation, and an "orientation for parenting."

Mother testified that Mike was arrested on March 14, 2023 for threatening to kill Laura, and her relationship with Laura got worse after Mike was arrested. On March 23, 2023, Laura threw Mother's and children's belongings on the front lawn and kicked Mother out of the house. Mother, who was eighteen years old at the time, testified that Mia was six-weeks old, and Eric was one year old. According to Mother, she and the children waited in Laura's driveway from 1:00 or 2:00 p.m. until 9:00 p.m. while Mother tried to find a place for her and the children to stay that was acceptable to the Department. According to Mother, the Department did not make

23

any effort to help her find a place to stay other than giving her a list of shelters she could call to find out if they had availability. Mother contacted the local shelters on the list, but none had room for her and the children. According to Mother, Mendoza suggested that she leave the children with Laura for a few days, but Mother refused to leave the young children alone with Laura because Mother did not trust her. Mother testified that she planned for her and the children to stay with a friend that night, but the Department refused to allow the children to stay with Mother's friend because it was not approved placement. Although she wanted to move back to El Paso, Mendoza advised her that the court order required her and the children to stay in Laura's home.

Mother testified that when they were not able to locate a place for Mother and the children to stay by 9:00 p.m., the Department told Mother they had to remove the children from her care and place them in foster care. Mother testified that when the Department asked for the names of possible placements for the children, Mother gave the Department Shaw's name and the names of Mother's stepfather, uncle and her aunt, and all of them were willing to take the children.

Mother stayed with a friend after Laura kicked her out of her home and she used $900 her great-grandmother sent her to rent an apartment on North Avenue in Freeport. She testified that although she could have moved back to El Paso with the money, she decided to stay in Brazoria County to be close to Eric and Mia. When

asked why she moved to El Paso in February 2024, even though the children were still in Brazoria County, Mother testified that the Department told her the children would be returned to her if she "moved back to El Paso with [her] support system." She testified she would have moved to El Paso in March 2023 if the Department had told her then that moving to El Paso would help her get the children back.

Mother and Mike lived in the apartment on North Avenue for a few months and Shaw, who moved to Freeport to "help with the case," rented an apartment in the same complex where Mother and Mike were living. After the Department told Mother that the arrangement "wouldn't work," Mother moved to a new apartment in May or June 2023 on Yaupon Street. Mother testified that she could not afford to pay the rent for the apartment on Yaupon Street on her own and she was evicted in January 2024, because she and Mike broke up in November 2023, and he moved out of the apartment and stopped supporting Mother financially. Mother testified that she did not believe Mike was a good father when they lived together in the apartment in Freeport, but she stayed with him anyway until they broke up in November 2023.

Mother filed a motion in December 2023 asking the court to return the children to her care. The hearing on her motion was held in January 2024. Mother acknowledged that the trial judge told her she needed to do three things, and the court would determine at the next hearing whether the children would be returned to her. Mother acknowledged she was required to submit to a drug test the day of the

25

hearing, and she had to allow the Department to visit her apartment on Yaupon, but she did not remember if the trial judge had also asked her to obtain "suitable transportation and car seats for the kids." Mother testified that she took the drug test and allowed the Department to visit her home. By the time of trial, Mother had a valid driver's license, and her grandmother had bought her a car and was paying for auto insurance. Mother stated that she was making monthly payments for the car to her grandmother.

Mother stayed with a friend after she was evicted from her apartment on Yaupon Street on January 4, 2024. When asked if that was when she decided to return to El Paso, Mother testified that she wanted to stay in Brazoria County and when she spoke to the Department about her options, the Department told her that if she moved back to El Paso "with [her] support system, that they would transfer the case."

Mother returned to El Paso in February 2024. She moved several times after she returned to El Paso before she rented a large one-bedroom apartment on Francis Street. Mother testified that the apartment on Francis Street was the ninth place she had lived since Eric was born in December 2021. She leased the apartment on March 1, 2024, and she pays $950 per month in rent plus utilities. She was current on her rent payments. Mother testified that she does not have any roommates, and she had not been in contact with Mike for eight months.

According to Mother, the apartment has everything Eric and Mia need including beds, clothes, and toys. There are schools near the apartment and Mother is trying to enroll Eric in Head Start. She is eligible for daycare through the county, and she has family in El Paso that are willing to help with childcare if daycare is not available.

Mother testified that the courtesy caseworker in El Paso visited her apartment on Francis Street in June 2024 and took photographs. She admitted the caseworker had tried to visit Mother's previous homes, but she was not home, and when the caseworker stopped by Mother's great-grandmother's home where Mother was living at the time, her great-grandmother was sick and would not let anyone in the house.

Mother agreed that she was supposed to visit with the children regularly and the Department came up with a visitation plan that would allow her to see the children once a week for at least an hour, and the in-person visitation plan never changed. Mother testified that she brought Eric and Mia food and read them books during her visits, and she only missed one visit with the children when she lived in Brazoria County. She was not able to visit with the children in person once she moved to El Paso. Mother testified she had not visited with the children while she was in Brazoria County for the trial because the Department did not offer her a visit.

She admitted, however, that she did not ask the Department or anyone else if she could visit the children.

Mother, who moved to El Paso in February 2024, testified that at some point she asked Naquita Paul, Eric's and Mia's conservatorship caseworker, to arrange for visits with the children, and Paul arranged for her to visit with the children virtually using Zoom. According to Mother, she was able to attend the virtual visits initially, but the Department changed the time of the visits, the Zoom links provided by the Department did not always work, and the fact that El Paso was in a different time zone than Brazoria County caused some confusion.

Mother admitted that she missed "a couple" of visits and her last visit with the children occurred on July 2, 2024, about a week before Hurricane Beryl made landfall and impacted Brazoria County. Mother testified that she tried joining another scheduled virtual visit in September, but no one else was there, so she sent a text message to Paul and asked Paul if she was going to attend. According to Mother, Paul sent her an updated link in September 2024, but the link "didn't work." She did not remember if she told anyone that the link was not working, but she believed that she emailed Paul about the issue. When asked how many times she had emailed Paul and asked to visit with the children, Mother testified that she did not remember the number of times she had contacted Paul, but she had everything

in writing and her attorney was copied on the text messages and emails she sent to Paul.

Mother testified she was also required to maintain employment and provide her caseworker with proof of employment. Mother testified that she worked briefly at a phone-repair shop when she first arrived in El Paso and was paid in cash. She also worked at a Valero gas station for six months and had a work-from-home customer service job. Mother testified that she currently works at a Mexican restaurant where she is paid in cash, and she has worked for Door Dash and Spark as a delivery driver. She testified that she can financially support her children without child support, and she receives Medicaid. Mother is planning to get her GED and then attend community college on a scholarship and become an MRI technician.

Mother testified that she did not provide Paul with proof of her customer service job even though Paul asked her to provide proof of employment. According to Mother, her courtesy caseworker in El Paso only asked her if she was employed. Mother testified that Paul asked her for proof of employment when Mother was working at Valero and Mother provided proof, but she gave it to her attorney, not Paul. According to Mother, Paul did not ask her to provide proof that she was employed by the Mexican restaurant, and she did not recall telling Paul that she did

not have a pay stub because the restaurant paid her in cash. She denied that Paul told her she could submit evidence that she was being paid in cash. Mother testified that although she was required to give the Department proof of employment, she provided proof to her attorney.

Mother's family service plan also required her to participate in services provided by the Department. Mother testified that she attended individual therapy with a counselor provided by the Department, she completed therapy in 2023, and she participated in a psychosocial evaluation in June 2023. She also attended a parent collaboration meeting, but when asked what she learned from the meeting, Mother testified, "Just things I already knew." According to Mother, it was "just like the basic rundown of like parent and like collaboration" and they covered "like how the parents are like acting, what are the strengths and the weakness as the family, how are you going to handle certain situations."

When asked what she learned during her parenting class, Mother testified that she "learned like how to handle  situations. . ." When asked what she meant when she testified that she "already knew" what they were teaching, Mother testified, "Just the basic parenting classes that they have provided through that conferences," such as "don't leave the baby, make sure the baby has a crib, don't sleep with the baby." Mother agreed that the parenting collaboration course was "about getting along with

the other parent," including "trying to deescalate situations where you would have an argument," and "making it safe for the kids."

## G.    Naquita Paul

Naquita Paul is Eric's and Mia's conservatorship caseworker, and she was assigned to their case in May 2023 after Department was appointed as the children's temporary managing conservator and the children were removed from Mother's care.  Paul first met with Mother and Mike in April 2023 when Paul and Mendoza went to Mother's and Mike's apartment in Freeport.  Although Paul had not been assigned to the case, she accompanied Mendoza on her visit because Mendoza was "kind of afraid" of Mike.  According to Paul, she "tag[ged] along for safety purposes and also just to reintroduce myself that I was going to be the current worker."  Paul testified that Mike was "kind of confrontational" with Mendoza.

Paul testified that Eric and Mia had been placed with Mary and Greg when she visited with Mother and Mike in April 2023.  According to Paul, Eric "appeared to be happy and bonded" with Mary and Greg.  When Paul visited Mary's and Greg's home, Eric would want them to read him a book or otherwise engage with him throughout the visit.  Although Mia was very young, Paul testified that it appeared that Mia was bonded with Mary and Greg because when Mary and Greg spoke to Mia, Mia would smile or reach for them and Mia and Eric were clearly bonded with one another.  Paul testified that she never heard Eric refer to Mary and Greg as mom

31

and dad. She did not have any concerns when she visited the children at their foster parents' home.

Paul testified that the Department had tried to place Eric and Mia with family members and requested a home study for Shaw. Shaw's home study, however, was not approved because Shaw had a prior case involving the Department that was "unable to determine" and Shaw, who had moved several times within the past two years, lacked the stability the children needed. According to Paul, Mother did not provide her with a name of any other family member as a possible placement for the children.

Paul testified that Mother had a family service plan in place when Paul was assigned to the case. Mother's plan required her to (1) "obtain and maintain legal verifiable employment or other source of verifiable income" and provide the Department with supporting documentation, (2) have "a current valid ID to identify herself, utilize public transportation, and form a positive support system for transportation to and from services," (3) "build a positive support system to help with the care of her children while maintaining employment," (4) "maintain a safe and stable home environment that is free from safety and hazardous conditions [and is] drug and alcohol free," (5) "allow her CPS caseworker to visit her home both announced and unannounced to monitor the home environment," (6) initiate and complete parenting classes and provide a certificate of completion, (7) participate in

32

eight to ten individual counseling sessions, (8) "actively participate in services outlined in her service plan," (9) attend at least one Parent Collaboration Group Meeting, (10) initiate and actively participate in a psychological evaluation and follow all the therapist's recommendations, and (11) "attend all visits with her children, court dates, and conference meetings and maintain contact with the agency."

Paul testified that Mother's family service plan required her to maintain a safe and stable home. According to Paul, Mother had an apartment on Yaupon Street in Freeport until she fell behind on her rent payments and was evicted in January 2024. Mother gave Paul a lease for her apartment on Francis Street in El Paso that began on March 1, 2024. When asked if the fact Mother had maintained the same address for seven months was evidence of stability, Paul testified that she could not verify that Mother "consistently lived at that address for seven months." Paul testified that she had not personally seen Mother's home on Francis Street, but the courtesy caseworker who visited the home in June 2024 told Paul she was not concerned about the home. Paul testified that the Department was concerned that Mike was with Mother when Mother moved to El Paso, but it did not have any evidence he was with her. Paul lost track of Mike's whereabouts in January 2024.

Paul testified that the home visits are important because they allow the Department to assess the safety and appropriateness of the house for the children.

Paul testified that the Department was eventually able to visit Mother's apartment on Yaupon Street and her apartment on Francis Street, but Mother regularly failed to cooperate with the Department's efforts to verify the safety and appropriateness of Mother's homes.

Regarding Mother's requirement to maintain employment and provide the Department with proof of employment or income, Paul testified that Mother had reported working at various jobs throughout the case, including McDonald's, Burger King, Valero, Uber, and a Mexican restaurant in El Paso. According to Paul, Mother told her in August 2023 that she was working at McDonald's, and she was being promoted to crew leader. However, when Paul contacted the McDonald's where Mother had been working, Paul was informed that Mother had been fired in August 2023.

Paul testified that although she had asked Mother to provide proof of employment, Mother only gave her one check stub from McDonald's and did not provide any proof of employment after she moved to El Paso. After Mother told Paul that she was being paid in cash for a job in El Paso, Paul told Mother she could have her employer write a letter stating how much Mother earns and how many hours Mother works, but Mother never provided Paul with a letter from her employer.

After Mike informed Jones in November 2023 that Mother was using drugs, Paul amended Mother's family service plan in December 2023 to require Mother to

34

submit to random drug testing.  Mike also told Paul that Mother had been using him for his money and when he had no money, "she would kick him out."  He also told Paul that he had filed a police report because Mother was trying to have him killed. According to Mike, Mother was "unstable at the time because she was hanging with a gang banger" and she had "some man living with her."  Paul spoke to Mother about Mike's allegations, and she asked Mother to take a drug test.  Paul scheduled the drug test for December 17, 2023, but when Paul saw Mother two days later during a visit with the children, Mother informed Paul that she had not gone for the drug test because of transportation issues, and she would take the test after the visit. According to Paul, Mother provided a urine sample, but she refused to provide a hair sample.  Paul testified that although Mother's original family service plan had required her to remain drug and alcohol free, it did not require Mother to submit to random drug testing because the Department was not concerned about Mother's possible drug use at the time.

In December 2023, Mother filed a motion for review asking the court to return the children to her care. The trial court held a hearing on Mother's motion on December 21, 2023.   During the hearing, the court stated that before the children could be returned to her care, Mother had to take a urinalysis and a hair follicle test, allow the Department to inspect her home, and provide a list of names of people who could transport the children.  The court stated that it would return the children to

Mother if Mother's drug tests were negative, and Paul believed that Mother's apartment was appropriate for the children. Mother took a urinalysis and a hair follicle test on December 21, 2023, and although her urine sample was negative, her hair sample tested positive for marijuana.

Paul also visited Mother's apartment on Yaupon Street on December 21, 2023, where Mother claimed to be living alone. When asked if she saw anything during her visit that indicated that Mike was still living there, Paul testified that she did not see any men's clothes or toiletries in the apartment, but she found prescription medication belonging to Mike. Paul, however, did not believe Mike was living there because Mike had "started making the allegations against" Mother in November 2023.

Regarding Mother's drug testing requirements, Paul testified that it is the Department's policy to ask parents to do random drug testing twice a month for urinalysis and "hair is quarterly." She testified that she receives the results of every drug test a parent takes, and she received the results of every drug test Mother took in this case. According to Paul, a parent's failure to submit to drug testing when requested is considered a positive drug screen.

When Paul met with Mother on January 23, 2024, Mother told her that she had been evicted from her apartment on Yaupon Street and she was staying with a friend in Webster. Mother was sent for drug testing that day, but Mother did not

appear. Paul later testified that Mother submitted to a make-up drug test in January, but Paul did not have a record of any test results. When asked about the results of Mother's March 2024 drug test, Paul testified that although Mother's urinalysis was negative for drugs, Mother's hair follicle test was positive, which indicated to Paul that Mother was "using some—some substance." Mother's April 10, 2024 test was negative. Mother was also sent for drug testing on May 3, 2024 and May 21, 2023. Paul did not have results for a May 3, 2024 test and Mother's May 21, 2024 urinalysis was positive for marijuana. Paul testified that the Department asked Mother to take a drug test on July 8, 2024, but she did not have test results for that date. Mother was also sent for drug testing in August 2024 and on September 3, 2024, but Paul did not receive results for those tests.

Mother's family service plan required her to attend all weekly visits with Eric and Mia. Paul testified that Mother attended most of the weekly in-person visits with the children while she lived in Brazoria County, but Mother missed the visits on October 3, 2023, October 10, 2023, and October 17, 2023. Paul later learned that Mother had been looking for housing in El Paso in October 2023. She testified that Mother moved to El Paso in February 2024, but Mother did not ask Paul about setting up virtual visits with the children before she moved. She also did not ask to see Mia on her first birthday in February 2024 or provide a birthday gift. Mother

did not ask Paul about Mia's birthday or ask about the child's medical appointments. Paul did not know that Mother moved to El Paso until Mother told her afterwards.

Paul testified that after Mother moved to El Paso, Paul arranged for weekly virtual visits beginning in March 2024. Although Mother initially attended the virtual visits, the visits were disrupted in July 2024, when Hurricane Beryl struck the Texas Coast causing widespread power outages, and Paul rescheduled one of the visits for July 19, 2024. According to Paul, Mother did not attend any other virtual visits or reach out to Paul regarding the visits until mid-September 2024. At Mother's request, Paul scheduled the virtual visits to resume on October 1, 2024, but Mother did not attend any visits in October. Paul testified that except for Mother's email in September 2024, Mother did not make any efforts to visit with the children or complain about being unable to visit with them. According to Paul, Mary and Greg never reported that the children behaved poorly after visiting with Mother or complained about the visits and they always made the children available for the weekly virtual visits with Mother.

According to Paul, weekly visits are important to maintain the bond between the parent and a young child and it reinforces the message to the children that even if they are not living with their parent, their parent is "there for them, that parent loves them, and, you know, will take care and meet all of their needs." Paul testified that Mother had not seen the children in person since February 2024, and her last

virtual visit with the children was in July 2024, three months before trial. According to Paul, the children appeared to recognize Paul because she visited them in person at their foster parents' home once a month and weekly when they were having virtual visits, but Paul "wouldn't say they recognized" Mother.

Paul testified that reunification with the parents was the Department's primary goal for the children when they came into the Department's care and the concurrent goal was a fictive kin conservatorship. In January 2024, the Department's goals changed and their primary goal for the children was a relative conservatorship, and the concurrent goal was unrelated adoption. According to Paul, the Department did not have a potential conservator or adoptive parent in mind.

After Mother moved to El Paso in February 2024, Paul asked Mary and Greg if they were willing to be a long-term placement for the children. Paul testified that the Mary and Greg, who had always been very supportive of reuniting the children with their parents, agreed to be a long-term placement for Eric and Mia if it was necessary to do so. According to Paul, the Department's goal in this case changed at a permanency conference in May 2024, and their primary goal for the children was unrelated adoption. Mary and Greg intervened in the case on June 5, 2024.

Paul testified that Mother had completed several of her provider services, such as participating in individual therapy, completing a domestic violence assessment, attending a parent collaboration group meeting, participating in a psychological

39

evaluation, and participating in parenting classes, and although it was not required by the Department, Mother had given Paul a certificate for intensive outpatient services which Paul assumed were for substance abuse. Paul could not verify the certificate's authenticity. According to Paul, there was a difference between "completing services, checking off boxes, and actually complying with the family plan of service" because compliance required a lifestyle change and Mother had not made "the kind of lifestyle changes that [Paul was] hoping to see in order to safely return her children to her."

When asked if she believed that Mother knowingly placed the children in a dangerous situation and knowingly put her children with a person who engaged in conduct that might be dangerous to the children, Paul testified that she believed that Mother did both things. Paul also believed that Mother abandoned the children when she moved to El Paso and stopped visiting the children.

Paul testified that the Department was asking the jury to terminate Mother's parental rights to Eric and Mia because Mother "hasn't shown an interest to have her children returned." Paul testified that in addition to missing virtual visits with the children, Mother never asked Paul about the children, inquired about their well-being, or asked for photographs of the children, and she also did not cooperate with

40

the Department's efforts to visit her homes in Brazoria County and El Paso, which is one of the first steps in the reunification process.[4]

According to Paul, termination of Mother's parental rights to Eric and Mia was in the children's best interest because the children "deserve[d] stability and someone that is going to be there to meet their needs daily and not having to worry about being uprooted and moved place to place to place and just for someone to generally care about, you know, their needs and what it takes to be a parent."

When asked what more Mother could have done to get her children back, Paul testified that Mother "could have been more cooperative with allowing the Department to do those unannounced visits" to her home and, if she was not home, Mother could have taken the initiative to contact the Department and schedule a visit. Paul testified that Mother also failed to comply with the Department's requests for drug testing, and she did not make her visits with the children a priority. According to Paul, Mother has not reached out to her or said that she wants her children back since Mother moved to El Paso.

## H.    Mary

Mary is the children's foster mother. Eric and Mia were placed with Mary and her husband Greg in March 2023, but Eric was placed with a family friend and

---

[4]    Paul testified that the Department was asking the jury to terminate Steve's parental rights to Eric and Mike's parental rights to Mia.

41

Mia was returned to Mother's care after a hearing in April 2023. Eric and Mia were placed with Mary and Greg after Mother and Mike were arrested in May 2023, and the children lived with Mary and Greg until trial in October 2024. Mary testified Eric and Mia were healthy when they were placed in her home, and she believed that the children's needs had been met prior to coming into her care.

Mary testified that Eric, who was initially placed with her when he was fifteen-months old, was almost three years old. According to Mary, Eric is an energetic child with a lot of energy and a "big personality." Eric loves dinosaurs and he enjoys riding his scooter bike, playing at the park, and playing with his friends at church. Mary testified that Eric gets excited when Mia wakes him up in the morning, when he sees Mary and Greg coming home from work, and "food also excites him."

Eric attends daycare and he usually plays outside for an hour before eating dinner, taking a bath, and going to bed. Mia is Eric's favorite person, and he loves her very much. Eric also knows and spends time every month with Mary's and Greg's extended family members who live in Houston, and Eric regularly speaks to Mary's and Greg's other family members, and he can recognize their voices on the phone.

Eric is a "little skittish at first" when he is in a new or unfamiliar situation, but "he usually warms up to people." He seeks out Mary or Greg if he is a little scared.

According to Mary, Eric is "very caring" and empathetic and "he is always checking on people." He is "lots of fun" and "definitely brings the life and joy to any room that he walks into." Mary testified that Eric is very energetic, and he is "[a]lways running around and playing with friends." Eric is also "pretty good about listening [the] majority of the time."

According to Mary, Eric is physically healthy and meeting his milestones. He is speaking in full sentences, and Mary and Greg generally understand what Eric is saying. Mary testified that she and Greg generally refer to each other by their first names when they are around the children and Eric calls her Mary or Mama. Eric recently started play therapy, which he attends once a week. Mary testified that Paul suggested they enroll Eric in play therapy after Eric started having some issues in daycare. According to Mary, Eric is a "little bit of a biter," but he is improving.

Mia was six weeks old when she was placed with Mary and Greg. Mary testified that Mia, who was twenty months old at the time of trial, is "feisty," "really fun," and has a "great personality." Although she is "very independent" and opinionated, Mia is shyer than Eric and it takes her time to warm up to new people. When she is scared, Mia seeks out Mary for comfort.

Mary testified that Mia is "very independent" and an affectionate child who loves giving hugs and kisses and has a "strong personality." Mia also loves playing outside, playing with Eric, reading books, and playing with her stuffed animals. She

43

gets excited when she sees Mary and Greg and she is excited to wake up Eric in the morning. She attends daycare and she has the same daily routine as Eric. According to Mary, Mia is in "kind of a defiant stage," but she listens well for the most part. Mia also enjoys spending time with Mary's and Greg's family members and she gets excited when she talks to Mary's mother on the phone. Mia is physically healthy, she is meeting her milestones, she knows some words, and her pronunciation is improving. She refers to Mary and Greg as Mama and Dada.

Mary testified that she and Greg had been married for seven and a half years and they had lived for six years in a four-bedroom single-family home that is close to a park and in a "quiet, family friendly neighborhood." Mary testified that she has never been arrested, incarcerated, used illegal drugs, fled in a stolen car with Eric inside, or burglarized a building.

According to Mary, Greg is a good father who takes care of Eric and Mia, "loves them, spends time with them." Mary testified that she and Greg can have biological children, and they decided to foster because they have "always had a heart for kids in difficult situations" and they wanted to provide a safe place for those children for "however long they needed it." Mary testified that she believes children should be reunited with their parents, and if that does not happen, the children should be placed with family, when possible.

Mary testified that she and Greg fostered three children before Eric and Mia, and all three children were reunited with family members. When Eric and Mia were placed with Mary and Greg, Mary assumed Eric and Mia would be reunited with their family, too. Mary testified that she and Greg are open to adopting a child who needs a "place to be forever," but the goal is always for a child to be reunited with their family.

Mary testified that it is important for Eric and Mia to know their biological families, and she never tried to keep the children from Mother. Mother has Mary's phone number and email address, and although Mary never expressly encouraged Mother to contact her, Mary believes she had been "warm in all of [her] emails" to Mother. When Mother lived in Brazoria County, Mary and Greg gave Mother notebooks during her visits with the children that included photographs of Eric and Mia and weekly updates on their general well-being, including their activities, and medical visits. After Mother moved to El Paso, Mary sent Mother email messages with photographs of the children and updates, including a May 2024 message wishing Mother a happy Mother's Day. Mother responded and thanked Mary, expressed her appreciation, and wished Mary a happy Mother's Day. That was the only email message Mary received from Mother.

Mary never observed Mother interact with the children in person and the children did not behave differently after their in-person visits with Mother. Eric did,

however, have a difficult day at daycare after one virtual visit. Mary testified that the Zoom links Paul sent her always worked and although Mother initially participated in weekly virtual visits with children, Mother stopped attending the visits in July 2024.

When asked if she wanted Mother's, Mike's, and Steve's parental rights terminated, Mary said that she and Greg "want what is best for [Eric] and [Mia], whatever that is." Mary testified that Eric and Mia need a safe place to live, and the children would do well in a long-term placement with her and Greg because Eric and Mia had lived with them for most of their lives and they loved everything about the children. Mary testified that she was not aware of any family members who would be suitable placements for Eric and Mia and she and Greg would adopt the children "if that is something that [the children] need."

## I.  Faye Gordon

Faye Gordon is Eric's and Mia's court-appointed guardian ad litem. Gordon testified that it was in Eric's and Mia's best interests for Mother's parental rights to be terminated "so that they would have an opportunity to find a safe, stable, loving home." She also testified that it was in Eric's best interest for Steve's parental rights to be terminated and termination of Mike's parental rights was in Mia's best interest.

Gordon testified that she "believe[s] children deserve to be in a safe, stable home, taken care of, provided love and affection" and Eric and Mia "deserve a safe,

stable, loving environment with consistency and people who would care about them."  According to Gordon, a stable home is "a place where [the children] know at the end of the day they're coming home to the same residence; that they will have a routine, generally; they are—know that they will have food and be clothed; that they participate in activities . . . together as a family."  Gordon testified that Eric and Mia had been in foster care for eighteen months, and she visited the children three times at Mary's and Greg's home, which Gordon described as "safe, loving, and stable."

Gordon testified that she met with Mother when the case began in 2023, and she observed Mother and the children together once before Mother moved to El Paso in February 2024.  According to Gordon, Mother "is a loving parent" and she was "attentive during the time that she was visiting with the children."  Gordon testified that Eric and Mia appeared to be bonded with Mother, and the children knew who she was.

Gordon visited Mother's apartment in Freeport in 2023, and she did not observe anything in the apartment that made it unsafe.  According to Gordon, it was a "regular, nice apartment" and it appeared to be ready for the children to move in.  She testified that she understood when she visited the apartment that Mother had completed her services, and she was in favor of returning the children to Mother's care.  Mike was living with Mother in Freeport and Gordon noticed during her visit

47

that "it was very easy for him to become agitate[d]." According to Gordon, Mike was anxious and "he would just kind of go off a little bit." Gordon testified that the Department did not want Mother and Mike to live together or Mother to allow Mike to visit the children if they were in her care.

Gordon agreed that the Department's goal is to reunite children with their families, and it is better for a child to be returned to their parent or placed with a family member as opposed to remaining in foster care, "when that's possible." According to Gordon, the Department was willing to reunite Mother with Eric and Mia after Mother moved to El Paso in February 2024, but Mother "missed some of the steps that were necessary for the children to be returned." Specifically, Mother failed to regularly visit with the children and cooperate with the Department's efforts to visit her apartment. According to Gordon, the Department tried for three months "before [Mother] would ever open the door." Gordon testified that when the courtesy caseworker in El Paso was able to visit Mother's apartment in June 2024, Mother did not "have anything for the kids" except beds.

Although Gordon did not believe that Mother posed a danger to Eric's and Mia's emotional or physical development, she was concerned about Mother's ability to provide Eric and Mia with the stability they needed. Gordon testified that Mother had not provided any evidence that she was employed, had regular income, or was

48

able to pay the rent for her current apartment. According to Gordon, Mother was behind in her rent payments and was subject to eviction.

Although Gordon had spoken to the caseworker about Mother's efforts to work her services, Gordon never visited Mother in El Paso, spoke to Mother's landlord, or met Mother's family members in El Paso. She admitted that because she had not seen Mother's apartment in El Paso, or spoken to Mother's family members in El Paso, she could not say whether Mother's home was adequate or whether her family members would be appropriate caretakers for the children.

Gordon testified that it was in the children's best interests for Mother's parental rights to be terminated because it would give the children "an opportunity to find a safe, stable, loving home" and the permanency they needed. She testified that if Mother's rights are not terminated, it would "delay permanency" for Eric and Mia because the Department "would still be looking for someone to place the children with."

## J. Decree of Termination

On November 25, 2024, the trial court signed a decree of termination terminating Mother's parental rights to Eric and Mia based on the court's findings that Mother committed the predicate acts under Family Code Sections 161.001(b)(1) (D), (E), (N), and (O), and that termination of Mother's rights was in Eric's and

Mia's best interest. The court also appointed the Department as Eric's and Mia's sole managing conservator.[5] This appeal followed.

**Termination of Mother's Parental Rights to Eric and Mia**

Mother argues there is legally and factually insufficient evidence supporting the jury's findings that (1) she committed the predicate acts under Family Code Section 161.001(b)(1)(D), (E), (N), and (O), and (2) termination of her parental rights was in Eric's and Mia's best interest.

Sections 161.001(b)(1)(D) and (E) authorize the termination of a parent's rights to a child when the parent has endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E). Under Section 161.001(b)(1)(N), a parent's rights to a child may be terminated if the parent has constructively abandoned the child who has been in the Department's conservatorship for at least six months, the Department made reasonable efforts to return the child to the parent, the parent did not regularly visit or maintain significant contact with the child, and the parent has demonstrated an inability to provide the child with a safe environment. *Id.* § 161.001(b)(1)(N). Under Section 161.001(b)(1)(O), a parent's rights to a child may be terminated if the parent "failed to comply with the provisions of a court order that specifically established the

---

[5] The decree of termination also terminated Steve's parental rights to Eric and Mike's parental rights to Mia, but neither Steve nor Mike appealed from the decree.

actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." *Id.* § 161.001(b)(1)(O).

## A.    Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a] parent[ ] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination

51

proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

A court may terminate the parent-child relationship under Section 161.001 if the Department establishes, by clear and convincing evidence, that (1) the parent has engaged in one or more of the enumerated predicate acts or omissions under Section 161.001(b), and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). "Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact." *In re M.A.J.*, 612 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2020, pet denied). Only one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We look

at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). We assume the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.C.*, 560 S.W.3d at 630–31. We must disregard all evidence that a reasonable factfinder could have disbelieved or found not to be credible. *In re J.F.C.*, 96 S.W.3d at 266. But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard in termination cases, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id*.

When conducting a factual sufficiency review in a termination case, we must consider the entire record. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266. Unlike in a legal sufficiency review, when assessing the factual sufficiency of the evidence, we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re J.F.C.*, 96 S.W.3d at 266; *see*

53

*also In re A.C.*, 560 S.W.3d at 630 ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."). "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Under both legal and factual sufficiency standards, the factfinder is the sole arbiter of a witness' credibility and demeanor and the weight of the evidence. *In re J.O.A.*, 283 S.W.3d at 346; *see In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

## B.     Endangerment Findings Under Section 161.001(b)(1)(D) and (E)

In her first and second issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding under Section 161.001(b)(1)(D) that she endangered Eric and Mia by knowingly placing or knowingly allowing the children to remain in conditions or surroundings which endangered their physical or emotional well-being, or under Section 161.001(b)(1)(E) that she endangered Eric and Mia by engaging in conduct or

knowingly placing the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E).

### 1. Applicable Law

Sections 161.001(b)(1)(D) and (E) authorize the termination of a parent's rights to their child when the parent has endangered the child's physical or emotional well-being. The term "endanger," as used in Section 161.001(b)(1)(D) and (E), encompasses a broad "array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct which subjects child to life of uncertainty and instability endangers child's physical and emotional well-being). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The danger to the child may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury"). A parent's use of illegal drugs

constitutes endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d at 345.

Under Section 161.001(b)(1)(D), a parent's rights may be terminated if clear and convincing evidence establishes the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D). This subsection concerns the child's living environment, rather than the parent's conduct, although parental conduct may produce an endangering environment. *See Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re A.J.A.*, No. 01-21-00299-CV, 2021 WL 5702183, at *7 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. denied) (mem. op.). Thus, when seeking termination under Subsection (D), the Department must establish that the child's living conditions "pose a real threat of injury or harm to the child." *In re N.R.*, 101 S.W.3d 771, 776 (Tex. App.—Texarkana 2003, no pet.). The child's environment refers to the acceptability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d at 360. "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom

the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *Id.* "A parent does not need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient." *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.) (citing *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.— San Antonio 2017, no pet.)); *see also In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards."). A parent's rights may be terminated under Subsection D based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.).

A parent's rights may also be terminated under Section 161.001(b)(1)(E) if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Unlike Subsection (D), termination under Subsection (E) focuses on the parent's conduct and requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In*

*re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also Jordan*, 325 S.W.3d at 723. Subsection 161.001(1)(E) asks whether "the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re J.T.G.*, 121 S.W.3d at 125. Thus, the relevant inquiry under Section 161.001(b)(1)(E) is whether there is evidence the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *Jordan*, 325 S.W.3d at 723.

### 2. Analysis – Section 161.001(b)(1)(D)

Mother argues there is legally and factually insufficient evidence supporting the jury's finding she knowingly placed or knowingly allowed Eric and Mia to remain in conditions or surroundings which endangered their physical or emotional well-being" because there is no evidence that her decision to remain in the house with Eric during the two-hour police standoff on December 14, 2022 "created a dangerous environment." According to Mother, the evidence clearly establishes that Mike alone created the dangerous situation inside the home. She also argues that the Department failed to prove that she knowingly placed or knowingly allowed Eric and Mia to remain in an endangering situation because there is no evidence that she was aware at that time that Eric and Mia were in danger, and there is no evidence that Eric's and Mia's living condition before and after the police standoff endangered their physical or emotional well-being.

Every witness who testified at trial, including Mother, testified that the conditions inside Laura's home on December 14, 2022 were dangerous, and the undisputed evidence supports their testimony. The record reflects that the incident began when Laura tried to take one-year-old Eric away from Mike as Mike was trying to put the child down for a nap. According to Mother, the argument escalated when Laura tapped Mike on the shoulder several times. Mike, who claims that Laura pushed him and caused him to strike his heel on something, became enraged and yelled and screamed at Laura. Although Mother denied that the argument became physical, the situation was concerning enough that both Mother and Laura called 9-1-1. Mother told Dr. Stadler that she called the police because "in the past 'we'd call the police and they'd deescalate the situation.'"

The undisputed evidence reflects that Mike was "tripping and going crazy" and still "yelling and screaming" at Laura when the police first approached the home. Mike, who Mother knew had "a knife in his backpack," threatened to kill himself and the police if they entered the house, and he told the first officer who tried to calm him down that if the officer came inside, the officer would have to kill Mike. According to Mother, "the police had their hands on their holsters already" when they arrived and the "fire department, SWAT" team, and McCain, the mental health officer, were also dispatched to the scene. It is undisputed that the officers surrounded the outside of the home with their guns drawn and Mother was aware of

59

this fact because she told Jones that "there were police surrounding the house, their guns were drawn, they were on their knees in the backyard, front yard, and more kept coming."

When McCain first approached Mike, Mike was standing in the front doorway of the house holding "a large kitchen knife in his right hand" and "threatening to kill any police officer's that stepped foot inside" the house. He was making statements such as, "you're gonna have to kill me." Mike, who was holding a Molotov cocktail, told McCain that he was "going to blow it up" if anyone came inside and if the officers standing outside the house did not move back, "this bitch is gonna burn." According to McCain, Mike was in a "state of anger due to possible PTSD."

When asked if Mike ever threatened Eric or Mother, McCain testified, "Not directly, but I believe that in his statement that 'I'll burn the house down with everybody in it' is an indirect threat." McCain asked Mike if Mother and Eric could leave, and Mike told McCain that Mother was "not going anywhere," and neither was Eric. McCain testified that he understood Mike's statement as another indirect threat to Mother. McCain testified that "everything [Mike] said was indirect" and although Mike "never a direct statement of harm towards" Mother, "it was definitely a broad spectrum saying that he was going to."

Mother, who was seven months pregnant with Mia, and Eric remained in the home with Mike while the entire incident transpired. According to Mother, she

60

stayed with Mike because she was trying to calm him down and she was afraid that the police would harm him, and she had no intention of leaving him. Mother believed that Eric was not in physical danger while he was with Mike because Eric was with her and Mike had never harmed or been physically violent towards Eric. Mother testified that she did not leave after Mike threatened to kill the police because Mike "didn't direct that threat towards me. He directed it towards the police." When asked if she thought the Mike "holding a Molotov cocktail and . . . threatening a fire was a danger to [Eric,]" Mother testified that, at the time, she did not believe Eric was in danger and she was never concerned that Mike would physically harm her or Eric. At trial, Mother testified that watching McCain's body camera video gave her a new perspective on what transpired inside Laura's home on December 14, 2022, which she described as a "hostage situation" that was "actually very, very dangerous." Mother, however, did not feel like she and Eric were being held hostage at the time, and she believed she could have left house with Eric at any time. Mike also informed a Department investigator that he had told Mother she could leave the house during the standoff. McCain testified that "it was 100 percent dangerous" for Mother and Eric to be in the house with Mike, but Mother never appeared to be scared or in distress and she was talking on her phone and making jokes towards the end of the standoff.

61

Mike's violent outbursts while armed with a large kitchen knife and Molotov cocktail and threats to kill the police and blow up the house while Mother and Eric were present undeniably posed a threat of harm or injury to Mother and the children, even if Mother and the children were not harmed or directly threatened. *See Boyd*, 727 S.W.2d at 533 (stating danger to child may be inferred from parental misconduct even if conduct is not directed at child and child suffered no actual injury); *In re N.R.*, 101 S.W.3d at 776 (stating Subsection (D) requires evidence child was placed in or remained in circumstances that "pose[d] a real threat of injury or harm to the child").

Regardless of who created the circumstances inside the home on December 14, 2022, it is undisputed that Mother, who believed that she could leave with Eric at any time, chose to remain inside the home with Eric to protect Mike. Mother does not dispute that she was aware of the dangerous circumstances inside and outside the home during the two-hour standoff on December 14, 2022. Rather, Mother argues that she was unaware at the time that she and the children were in danger because she did not believe Mike would hurt her or Eric and Mike never threatened her. According to Mother, there is no evidence that she knowingly placed or knowingly allowed Eric and Mia to remain in an endangering situation because she did not appreciate the seriousness of the circumstances inside the home or the peril that she and children were in until later.

The jury, as the sole arbiter of witness credibility, was not obligated to believe Mother's testimony that she did not know she and Eric were in danger while they were with Mike during the police standoff on December 14, 2022, or credit Stadler's testimony that she did not get the impression when she spoke to Mother in June 2023 that Mother would knowingly place Eric and Mia in danger. *See In re J.O.A.*, 283 S.W.3d at 346 (stating that factfinder, not appellate court, is sole arbiter of witness' credibility). Furthermore, a "parent does not need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient." *In re I.N.D.*, 2020 WL 2441375, at *3.

Mother argues that she was unable to appreciate the danger to her and Eric at the time because her impulse control issues and ADHD "affected her ability to fathom the gravity of a given situation." However, when asked if Mother was potentially unable to appreciate the seriousness of certain situations, Dr. Stadler testified that Mother was intelligent, acted like an adult and had "reasonable insight" for someone her age.

The jury reasonably could have inferred from the evidence that Mother had the ability to recognize dangerous situations and that when confronted with the objectively dangerous circumstances that existed inside the house with Mike during the two-hour standoff, Mother recognized the potential danger posed to her and Eric by remaining inside the home, yet chose to disregard the danger because she wanted

63

to stay to protect Mike. *See In re M.R.J.M.*, 280 S.W.3d at 502 (stating parent knowingly places or allows child to remain in endangering environment when parent is aware of potential danger but disregards it); *see also In re B.M.S.*, 581 S.W.3d at 917 ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").

Mother argues she did not knowingly endanger herself or Eric by staying in the house to calm Mike down because McCain, who utilized her presence in the home to help him deescalate the situation, "allowed [Mother] to stay inside as she was helping calm [Mike]." But McCain did not ask Mother for help and there is no indication that McCain wanted Mother and Eric to stay in the house. Rather, McCain testified that he believed Mother and Eric were Mike's hostages, and he tried to convince Mike to let Mother and Eric leave the house.

The two-hour standoff ended when McCain transported Mike to a psychiatric hospital. The record reflects that Mother was aware of Mike's anger issues and violent tendencies prior to the standoff because Mother had seen Mike punch Steve and point a gun at Shaw and Shaw's husband. Mother had also told Steve that Mike "gets angry" and "had put his hands on her." Despite being aware of Mike's mental health and anger issues and his propensity for violence, Mother and Eric continued living with Mike even after he was released from the psychiatric hospital on December 17, 2022. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston

[14th Dist.] 2003, no pet.) ("A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being [and d]omestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment.").

Mother, Eric, Mike, and Mia, who was born in February 2023, lived together in Laura's home until Mike was arrested in March 2023 for threatening to kill Laura. Mike admitted to the Department that he was no longer seeking treatment for his mental health issues. Mendoza met with Mother and Laura after she learned of Mike's arrest, and they signed a family agreement plan with the Department in which Laura agreed that she "would not allow [Mike] back in the home due to the concerns regarding his mental health and . . . his arrest for terroristic threat. After Laura kicked Mother and the children out of the house in March 2023, Mother rented an apartment and Mother allowed Mike to move into the apartment after he was released from jail. Mike lived in the apartment with Mother and Mia. Mother moved to a second apartment, where she and Mia continued to live with Mike until Mother and Mike were arrested in May 2023 and charged with felony robbery. According to Mother, Mendoza told her multiple times that she needed to break up with Mike before she and Mike were arrested in May and the Department removed Eric and Mia from her care.

This evidence indicates that despite Mike's untreated mental health issues, recent violent, criminal behavior, and the Department's concerns about the children's safety when they were around Mike, Mother and Mia continued living with Mike. *See id.*; *In re S.R.*, 452 S.W.3d at 363 (stating "[u]ntreated mental illness can expose a child to endangerment . . . and is a factor the court may consider"). Although Mother denied that Mike punched Steve, pointed a gun at Shaw and her husband, and was physically violent towards her, it was the jury's province as the sole factfinder to disbelieve Mother's testimony on this point. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor).

Regardless of the children's living conditions before the standoff, the fact that Mother knowingly placed or allowed Eric and Mia to remain in endangering circumstances on December 14, 2022 and afterwards by continuing to live with Mike is sufficient to support termination of Mother's parental rights to the children under Subsection (D). *See In re L.E.S.*, 471 S.W.3d at 925 (stating parent's rights may be terminated under Subsection D based on single act or omission by parent).

Viewing the evidence in the light most favorable to jury's finding, we conclude the jury could have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Eric and Mia to remain in conditions or

surroundings which endangered their physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the jury from forming a firm belief or conviction that Mother knowingly placed or knowingly allowed Eric and Mia to remain in conditions or surroundings which endangered their physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re J.F.C.*, 96 S.W.3d at 266.

Because there was clear and convincing evidence supporting the jury's findings under Section 161.001(b)(1)(D), it is not necessary for us to decide whether there was also sufficient evidence supporting the jury's findings that Mother committed the predicate acts under Section 161.001(b)(1)(E), (N), and (O). *See In re A.V.*, 113 S.W.3d at 362 (stating only one predicate finding under Section 161.001(b)(1) is necessary to support decree of termination when there is also finding that termination is in child's best interest).

We overrule Mother's first, second, third, and fourth issues.

## C. Best Interest

In her fifth issue, Mother argues there is legally and factually insufficient evidence supporting the jury's finding that termination of her parental rights was in Eric's and Mia's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### 1. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-

child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Factfinders may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support

system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

## 2. Analysis

Mother argues it was not in Eric's and Mia's best interest to terminate her parental rights because she was a loving mother who maintained regular visits with the children while she lived in Brazoria County, and the children are bonded with her. She argues she completed all the required services necessary for her to be reunited with Eric and Mia and she enrolled in an intensive outpatient drug program after she tested positive for marijuana in March 2024, even though she was not

70

required to do so. According to Mother, there is no evidence she knowingly endangered Eric and Mia, and by the time of trial, she had obtained a safe and stable home for the children and was financially stable.

Multiple factors support the jury's finding that termination of Mother's parental rights was in Eric's and Mia's best interest, the first of which is Mother's endangering conduct. In addition to supporting the jury's finding under Subsection (D) that Mother endangered Eric and Mia, the evidence that Mother knowingly placed or allowed Eric and Mia to remain in an endangering environment by staying in the house with Eric during the police standoff also supports the jury's best interest finding. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

There is also evidence that Mother engaged in other endangering conduct. Although Mother testified that she had never seen Mike have a mental episode before the police standoff on December 14, 2022, there is evidence that Mother and Eric were present when Mike assaulted Steve and when Mike pointed a gun at Shaw and Shaw's husband. Jones also testified that Mother had told Steve before December 14, 2022 that Mike "gets angry" and "had put his hands on her." There is thus some evidence that, prior to December 14, 2022, Mother knew that Mike had violent tendencies and anger issues, and that Mike had physically assaulted her and Steve. *See In re J.I.T.P.*, 99 S.W.3d at 845 ("A parent's abusive or violent conduct can

71

produce a home environment that endangers a child's well-being."). Although Mother denied that Mike had ever been violent towards her, punched Steve, or pointed a gun at Shaw and Shaw's husband, the jury, as the sole arbiter of witness credibility, was entitled to disbelieve Mother's testimony on this point. *See In re J.O.A.*, 283 S.W.3d at 346 (recognizing factfinder, not appellate court, as sole arbiter of witness' credibility and demeanor).

Mother testified that she continued to live with Mike after he was discharged from the psychiatric hospital because she was pregnant with Mike's daughter, Mia, and Mike was working and they had plans to get their own apartment and start a family. Mother, who was not working at the time, testified that she was financially dependent on Mike. Mother and Mia lived with Mike in April and May 2023, even after Mike had been arrested for threatening to kill Laura, Mike had admitted in March 2023 that he was no longer seeking treatment for his mental health issues, and Mendoza had indirectly told Mother that she needed to break up with Mike. The record thus reflects that despite knowing about Mike's propensity for violence and awareness of the Department's concerns about the children's well-being when they are around Mike, Mother chose to continue living with Mike, creating the possibility that the children would be exposed to another of Mike's violent episodes. *See In re J.I.T.P.*, 99 S.W.3d at 845 ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment."); *see also In re S.G.*,

72

No. 02-14-00245-CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no pet.) (mem. op.) (stating "abusive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being").

Mother told Stadler that she and Mike separated in June 2023 because Mike "wasn't providing for her . . . financially or providing for the child financially." Although she denied wanting to reconcile with Mike, Mother told Stadler that she and Mike were "working on it slowly" and she did not "plan on breaking up with him." Mother and Mike reconciled thereafter and the lived together until they broke up again in November 2023. Mother was evicted from her apartment in January 2024 because Mike was no longer supporting her financially and she could not afford to pay the rent on her own. Mike told Paul in November 2023 that Mother used him for his money and "[o]nce he didn't have money anymore, she would kick him out." According to Gordon, Mother was behind on her rent and subject to eviction from her apartment in El Paso at the time of trial.

Although Mother denied at trial that she was in a relationship with Mike, wanted to reconcile with him, or was behind in her rent, it was the jury's province to disbelieve Mother's testimony on this issue. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor); *In re R.R.A.*, 687 S.W.3d at 279 n.50 (stating courts defer to factfinder's findings

73

regarding credibility of witnesses and weight to give their testimony, "including reasonable and logical inferences from the evidence"). The jury could also infer from this evidence, including Mike's and Mother's relationship history and Mother's financial troubles at the time of trial that Mother would reconcile with Mike in the future. *See In re J.O.A.*, 283 S.W.3d at 346; *In re R.R.A.*, 687 S.W.3d at 279 n.50; *see also In re O.N.H.*, 401 S.W.3d at 684 (stating parent's past conduct is probative of his future conduct when evaluating child's best interest); *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating parent's past endangering conduct supports inference that past conduct may recur and further jeopardize child's present or future physical or emotional well-being).

The jury could also infer from Mother's failure to protect Eric and Mia from Mike that she would not be able to protect the children in the future if they were returned to her care. *See In re O.N.H.*, 401 S.W.3d at 684; *In re R.W.*, 129 S.W.3d at 741. Mother's past endangering conduct is also an indication of her parenting abilities. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *18 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (citing *In re J.S.G.*, No. 14–08–00754–CV, 2009 WL 1311986, at *9 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.)); *Holley*, 544 S.W.2d at 372 (identifying parental abilities as best interest factor).

Eric's and Mia's young ages also support the trial court's finding that termination of Mother's rights was in the children's best interest because they require constant supervision by an adult who can meet their physical and emotion needs and protect them from harm. *See* TEX. FAM. CODE § 263.307(b)(1) (identifying child's age and physical and mental vulnerabilities as best interest factors); *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969, at *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages—five and six years old—rendered them vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Another factor that supports the jury's best interest finding is Mother's failure to maintain stable housing and employment throughout the pendency of the case. *See In re B.J.C.*, 495 S.W.3d at 39 (noting that child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination). Mother testified that she had lived at nine different addresses since Eric was born in December 2021, and six or seven of those residences occurred after Eric and Mia were initially removed from her care in March 2023. The Department had expressed concerns about Mother's ability to provide Eric and Mia with a safe,

and stable home from the time the children were taken into care because Mother continued to live with Mike even though he had untreated mental health problems, a history of violence, and he was serving deferred adjudication after he pleaded guilty to threatening to kill his mother, Laura, in March 2023, and Mother did not cooperate with the Department's efforts to visit her home to evaluate the home's safeness and stability, as required by Mother's family service plan. *See In re C.H.*, 89 S.W.3d at 28 (stating evidence supporting trial court's finding that mother failed to complete her family service plan also supported finding that termination is in child's best interest).

After Mother and Mike broke up in November 2023 and Mike stopped supporting Mother financially, Mother was unable to pay the rent for the apartment on Yaupon Street in Freeport and she was evicted in January 2024. Mother moved to El Paso in February 2024, and in March 2024, Mother leased an apartment on Francis Street, and she provided the Department with a copy of her lease. Mother testified that she moved into the apartment in March, and she was living there as of trial in October 2024. Although Mother testified that she was current on her rent, Gordon testified that Mother had fallen behind in her rent payments and she was subject to eviction. When asked if the fact that Mother had maintained the same address for seven months was evidence of stability, Paul testified that she could not verify that Mother "consistently lived at that address for seven months." Evidence

76

of Mother's failure to maintain stable housing throughout the pendency of the case supports the jury's best interest finding. *See Holley*, 544 S.W.2d at 372 (recognizing stability of home and ability to provide for child's current and future physical and emotional needs as best-interest factors); *In re A.J.–A.*, No. 14–16–00070–CV, 2016 WL 1660858, at *5 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, no pet.) (mem. op.) ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs.").

As the sole factfinder, it was in the jury's province to credit Gordon's testimony that testified that Mother was behind on her rent and was subject to eviction from her apartment on Francis Street in El Paso and disbelieve Mother's testimony on this point. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor). Similarly, it was in the jury's province to disbelieve Mother's testimony that she was able to support herself and the children financially, including affording to provide them with a safe place to live, because she testified that she had been financially dependent upon Mike, she was evicted from the apartment on Yaupon Street after Mike moved out and stopped supporting her financially, and Gordon testified that Mother was behind on her rent and was subject to eviction from her apartment on Francis Street in El

Paso.[6] *See id.* The jury could also reasonably infer from this evidence that Mother would be unable to meet the children's present and future need for safe, stable housing. *See In re O.N.H.*, 401 S.W.3d at 684 (stating parent's past conduct is probative of his future conduct when evaluating child's best interest); *In re R.R.A.*, 687 S.W.3d at 279 n.50 (stating courts defer to factfinder's findings regarding credibility of witnesses and weight to give their testimony, "including reasonable and logical inferences from the evidence").

The record also reflects that Mother failed to maintain stable employment during the pendency of the case. Mother reported holding eight different jobs since Eric and Mia were taken into the Department's care, most of which were in the food service industry and for food and grocery delivery companies. She testified she held five of those jobs after she moved to El Paso in February 2024, including working as a cashier at a Valero gas station for six months. *See In re S.R.*, 452 S.W.3d at 367 (considering parent's inability to maintain stable employment in determining

---

[6]     It is also notable that as it concerns Mother's relatives in El Paso who provided her some financial assistance during the pendency of this case, the Department determined that neither Shaw nor Mother's great-grandmother, Duarte, were suitable placements for the children because Shaw "moved a lot and she even stayed in hotels and that she also had CPS history" and Duarte was deaf and "was not physically able to care for the children." Duarte also refused to allow a Department caseworker to enter her home when Mother was staying there. There is no evidence that anyone from the Department contacted any of Mother's other relatives in El Paso, much less assessed the appropriateness of their homes for the children. There is thus no evidence that Mother had suitable alternative living arrangements for Eric and Mia should Mother be evicted from her apartment.

whether termination is in child's best interest); *see also In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at \*7 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (stating parent's failure to obtain and maintain stable housing and employment through eighteen-month pendency of case subjected her children to life of uncertainty and instability, endangering their physical and emotional well-being).

Mother also failed to provide the Department with verifiable proof of her employment, such as pay stubs, as required by her service plan. Paul testified that she had asked Mother to provide proof of employment throughout the case, but Paul received only one pay stub from a McDonald's restaurant that Mother worked at in Brazoria County and Mother did not provide any proof of income after she moved to El Paso. *See In re C.H.*, 89 S.W.3d at 28 (stating evidence supporting trial court's finding that mother failed to complete her family service plan also supported finding that termination is in child's best interest). Paul had also called the McDonald's to confirm Mother's employment, but she was told Mother had been fired. Mother testified that she was working at a Mexican restaurant earning cash. Paul testified that she told Mother she could provide a letter from her employer verifying her employment and earnings, but Mother never provided the letter. Paul therefore did not have proof of Mother's employment status.

The record also reflects that Mother tested positive for marijuana on December 21, 2023, March 4, 2024, and May 21, 2024, and she failed to attend at least six drug screenings between December 2023 and September 2024, suggesting that Mother continued to use illegal drugs. *See In re J.M.T.*, 519 S.W.3d at 269 (refusal to give hair sample permitted court to infer father refused testing because it would be positive); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding factfinder could infer that parent's failure to submit to court-ordered drug testing indicated parent was avoiding testing because they were using narcotics). Mother's use of an illegal substance while the case has been pending, despite knowing that maintaining sobriety was one of the requirements for reunification, also supports the jury's best interest finding. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *see also In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *5, *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.) (stating parent's single positive drug screen and his failure to submit to three additional drug screenings suggested continued illegal drug use by him and weighed in favor of trial court's best interest finding).

The record also reflects that Mother was arrested for felony robbery on May 6, 2023 while Mia was in her care. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child."). The grand jury no billed the charge in July 2024. Nevertheless, as a result of her arrest, Mother spent four days in jail and Mia was removed from Mother's care and placed with Mary and Greg. *See In re T.G.R.-M.*, 404 S.W.3d at 15 (concluding that although criminal charges were ultimately dismissed, charges supported termination of parent's rights because each time mother was jailed, she was absent from child's life and unable to provide for child's physical and emotional needs during that time).

Evidence of Mother's failure to satisfy the requirements of her family service plan also supports the jury's finding that termination of her parental rights was in Eric's and Mia's best interest. *See In re C.H.*, 89 S.W.3d at 28 (stating evidence supporting trial court's finding that parent failed to complete family service plan also supported finding of termination of parent's rights in child's best interest). While the record reflects that Mother completed many of her family service plan's requirements, such as participating in individual therapy, completing a domestic

81

violence assessment, attending a parent collaboration group meeting, participating in a psychological evaluation, and participating in parenting classes, the evidence also reflects she failed to comply with other requirements including "maintain[ing] a safe and stable home environment that is free from safety and hazardous conditions [and is] drug and alcohol free," maintaining verifiable employment or other source of income and providing the Department with supporting documentation, "maintain[ing] sobriety by submitting to random drug testing," and attending all visits with the children. *See id.*; *see also* TEX. FAM. CODE § 263.307(b)(10) (identifying parent's willingness and ability to seek out, accept, and complete counseling services as best interest factor).

Based on their observations of Mother's interactions with Eric and Mia during in-person visits, Gordon and Paul testified that Mother appeared to be bonded with Eric and Mia, and Gordon described Mother as a loving parent. Stadler testified that Mother showed an interest in Eric's and Mia's lives and nothing about their relationship seemed abnormal, and there was evidence that Mother's interactions with the children were appropriate. The record, however, reflects that Eric was twenty-six months old and Mia was one year old in February 2024, which is the last time Mother saw them in person. Mother's last virtual visit with the children was in July 2024, three months before trial. Paul testified that although Eric and Mia appeared to recognize her because she visited with them regularly, she "wouldn't

82

say they recognized" Mother. Although Stadler testified that Mother showed an interest in Eric's and Mia's lives when she spoke to Mother in June 2023, Paul testified that Mother never asked her about the children's well-being and effectively abandoned the children after she moved to El Paso in February 2024. It was the jury's province to credit Paul's testimony and disbelieve any testimony to the contrary. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court as factfinder is sole arbiter of witness' credibility and demeanor). Mother's failure to contact the children for three months before trial also supports the jury's best interest finding. *See In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) ("[A] trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being.").

Mother argues that while she may have struggled early on in the case to achieve stability, by the time of trial she had "a stable home, employment sufficient to support her children, and a car and driver's license to transport the children" and had otherwise "obtained everything she needed to provide her children with a safe and stable home." She also planned to get her GED and attend college with the goal of becoming an MRI technician. While evidence that a parent has improved their circumstances weighs against a best interest finding, such improvements do not conclusively negate past endangering behavior. *See In re J.O.A.*, 283 S.W.3d at 346 (stating "[w]hile recent improvements made by [the parent] are significant, evidence

83

of improved conduct, especially of short-duration, does not conclusively negate the probative value" of past behavior); *In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (stating "even strong evidence of improvement cannot conclusively negate past history"); *Jordan*, 325 S.W.3d at 732 ("Although evidence shows [the mother] has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices."). And as set forth above, there is significant evidence establishing Mother failed to establish she has a stable, long-term home or employment.

By all accounts, Eric's and Mia's foster parents Mary and Greg have provided Eric and Mia with a loving, safe, stable, nurturing, and drug-free home environment and both children are thriving in their care, thus demonstrating that Mary and Greg are able to meet Eric's and Mia's present and future physical and emotional needs. The record reflects that Eric and Mia have spent the majority of their young lives with Mary and Greg. Mia, who was twenty months old at the time of trial, was six weeks old when she was first placed with Mary and Greg, and Eric, who was almost three years old during trial, was placed with Mary and Greg when he was fifteen-months old. There is also evidence that Eric and Mia are well bonded to Mary and Greg, whom Mia refers to as Mama and Dada, and who are willing to adopt Eric and Mia if the Department is unable to place the children with a family member. *See*

*Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, child's desires, and stability of home or proposed placement as best interest factors); *see also In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires.").

Viewing the evidence in the light most favorable to the jury's finding, we conclude the jury could have formed a firm belief or conviction that termination of Mother's parental rights was in Eric's and Mia's best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the jury from forming a firm belief or conviction that termination of Mother's parental rights was in Eric's and Mia's best interest. *Id.*; *see also In re A.C.*, 560 S.W.3d at 631.

We overrule Mother's fifth issue.

### Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice


Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.